## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID L. OWENS, SR., Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>              v.<br><br>LIFEMD, INC. F/K/A CONVERSION LABS, INC., JUSTIN SCHREIBER, JUAN MANUEL PIÑEIRO DAGNERY, and MARC BENATHEN,<br><br>                              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff David L. Owens, Sr. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by LifeMD, Inc. f/k/a Conversion Labs, Inc. ("LifeMD" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by LifeMD; and (c) review of other publicly available information concerning LifeMD.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired LifeMD securities between January 19, 2021 and April 13, 2021, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     LifeMD is a direct-to-patient telehealth company. It offers a telemedicine platform that purports to help patients access licensed providers for diagnoses, virtual care, and prescription medications.

3.     On April 14, 2021, Culper Research issued a report alleging that "LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices." The report also alleged that several of the Company's executives were involved in "wide ranging fraud" at Redwood Scientific, which was charged by the U.S. Federal Trade Commission for "unlawful autoshipping, abusive telemarketing, and false claims." Specifically, according to Culper Research, "many customers are effectively duped into

1

purchasing subscriptions rather than one-time purchases" and LifeMD "makes cancellations difficult if not impossible."

4.      On this news, the Company's share price fell $2.84, or 24%, to close at $9.00 per share on April 14, 2021, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that many of LifeMD's executives were associated with Redwood Scientific when it was charged for unlawful autoshipping, abusive telemarketing, and false claims, and that they employed similar practices at the Company; (2) that LifeMD engaged in autoshipping products to unwilling customers to record recurring revenue and the Company made it difficult to cancel such subscriptions; (3) that certain of the purportedly licensed physicians on the Company's platform were not in fact licensed and faced disciplinary action; (4) that, as a result of the foregoing practices, the Company was reasonably likely to face regulatory scrutiny and/or reputational harm; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff David L. Owens, Sr., as set forth in the accompanying certification, incorporated by reference herein, purchased LifeMD securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant LifeMD is incorporated under the laws of Delaware with its principal executive offices located in New York. LifeMD's common stock trades on the NASDAQ exchange under the symbol "LFMD." LifeMD was previously known as Conversion Labs, Inc., and its common stock traded on the NASDAQ exchange under the symbol "CVLB." The Company's name was changed effective February 19, 2021, and the stock symbol changed effective February 22, 2021.

13.    Defendant Justin Schreiber ("Schreiber") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14.    Defendant Juan Manuel Piñeiro Dagnery ("Dagnery") was the Company's Chief Financial Officer ("CFO") until February 4, 2021.

15.    Defendant Marc Benathen ("Benathen") has been the Company's CFO since February 4, 2021.

16.    Defendants Schreiber, Dagnery, and Benathen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.    LifeMD is a direct-to-patient telehealth company. It offers a telemedicine platform that purports to help patients access licensed providers for diagnoses, virtual care, and prescription medications.

**Materially False and Misleading**
**Statements Issued During the Class Period**

18.    The Class Period begins on January 19, 2021. On that day, the Company announced

its preliminary fourth quarter and full year 2020 financial results in a press release that stated:[1]

Revenue for the fourth quarter is expected to total $13.6 million, up 265% from $3.7 million in the fourth quarter of 2019. Revenue for the full year is expected to total $38.0 million, up 205% from $12.5 million in 2019.

\*        \*        \*

Annual recurring revenue (ARR) generated by subscriptions reached $26.0 million by the end of the year, up 525% compared to the end of 2019 (see description of ARR, below). ARR increased by more than $3.0 million from November to December—another record-setting monthly gain.

Conversion Labs' head of corporate development, Corey Deutsch, commented: "Conversion Labs is playing an important role in making healthcare accessible to now more than 250,000 patients nationwide. ***We believe our growth in ARR and continued rapid expansion of this customer base demonstrates strong satisfaction with our products and services,*** and we expect it to further strengthen as we execute our strategic growth objectives in 2021."

19.    On March 29, 2021, LifeMD announced its fourth quarter and full year 2020

financial results, stating in relevant part:

**Q4 Financial Highlights**

- Revenue increased 227% to a record $12.9 million.

- 82% of Q4 2020 revenue was generated by subscriptions, up from 48% in Q4 2019.

- Telemedicine net orders increased 275% to more than 117,000.

- ***Annual recurring revenue (ARR) from subscriptions at December 31, 2020 reached $53.4 million, up 443% compared to the end of 2019 (see description of ARR, below).*** At March 29, 2021, ARR from subscriptions increased to $75.9 million, up 267% year-over-year.

\*        \*        \*

---

[1] Unless otherwise stated, all emphasis in bold and italics is added hereinafter.

- Launched LifeMD™ telehealth platform (formerly Veritas MD™) to deliver greater access and convenience to consumers seeking medical treatment, prescription medications and over-the-counter personal health products direct-to-home.

20.    On March 29, 2021, LifeMD held a conference call to discuss the fourth quarter and full year 2020 financial results. During the call, Defendant Schreiber touted that the "subscription rate for new telemedicine orders has grown from 20% early last year to now more than 91%" and Defendant Benathen stated that "[a]nnual recurring revenue, or ARR, from subscriptions at December 31, 2020 reached a record $53.3 million, up 443% compared to the end of 2019." Defendant Benathen continued: "As of today, we estimate our ARR from subscriptions was increased to $75.9 million, up 267% year-over-year." Defendant Benathen explained LifeMD's subscription business, stating:

> [M]ost of the subscription revenue and all of it on the telehealth business today is product driven, so what the customer gathers – on the prescription side say on Rex or it's on the OTC or prescription side on Shapiro – they get the products that they need for their given diagnosis, they will get that subscription every box shipped to their door[.] [W]e charge them on a recurring basis alternatively, we also do offer three months subscription options where you will get a three month supply and then it will get billed every three months. But it's truly ***recurring revenue in nature where we build a customer on a recurring basis every month auto ship, auto charge***.

21.    On March 30, 2021, LifeMD filed its annual report on Form 10-K for the period ended December 31, 2020 (the "2020 10-K"), affirming the previously reported financial results. As to the quality of the healthcare providers on its platform, LifeMD stated in its 2020 10-K:

> **If we are unable to attract and retain high quality healthcare providers for our customers, our business, financial condition, and results of operations may be materially and adversely affected.**
>
> Our success depends on our continued ability to maintain customer access to a network of qualified healthcare providers, which include medical doctors, physician assistants, and nurse practitioners. If we are unable to recruit and retain licensed physicians and other qualified providers to perform services on our platform, it could have a material adverse effect on our business and ability to grow and could adversely affect our results of operations. In any particular market,

providers could demand higher payments or take other actions that could result in higher medical costs, less attractive service for our customers, or difficulty meeting regulatory requirements. The failure to maintain or to secure new cost-effective arrangements with third party medical groups and independent providers on our platform may result in a loss of, or inability to grow, our customer base, higher costs, less attractive service for our customers and/or difficulty in meeting regulatory requirements, any of which could have a material adverse effect on our business, financial condition, and results of operations.

22.    Regarding LifeMD's compliance with applicable regulations, the 2020 10-K stated,

in relevant part:

> ***Although we have adopted policies and procedures designed to comply with these laws and regulations and conduct internal reviews of our compliance with these laws***, our compliance is also subject to governmental review. The growth of our business and sales organization and our future expansion outside of the United States may increase the potential of violating these laws or our internal policies and procedures. The risk of being in violation of these or other laws and regulations is further increased by the fact that many have not been fully interpreted by the regulatory authorities or the courts, and their provisions are open to a variety of interpretations. Any action brought against us for violation of these or other laws or regulations, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. If our operations are found to be in violation of any of the federal, state, and foreign laws described above or any other current or future fraud and abuse or other healthcare laws and regulations that apply to us, we may be subject to penalties, including significant criminal, civil, and administrative penalties, damages, and fines, disgorgement, additional reporting requirements and oversight, imprisonment for individuals and exclusion from participation in government healthcare programs, such as Medicare and Medicaid, as well as contractual damages and reputational harm. We could also be required to curtail or cease our operations. Any of the foregoing consequences could seriously harm our business and our financial results.

23.    The above statements identified in ¶¶ 18-22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) that many of LifeMD's executives were associated with Redwood Scientific when it was charged for unlawful autoshipping, abusive telemarketing, and false claims, and that they employed similar practices at the Company; (2) that LifeMD engaged in autoshipping products to unwilling customers to record

recurring revenue and the Company made it difficult to cancel such subscriptions; (3) that certain of the purportedly licensed physicians on the Company's platform were not in fact licensed and faced disciplinary action; (4) that, as a result of the foregoing practices, the Company was reasonably likely to face regulatory scrutiny and/or reputational harm; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

24.    On April 14, 2021, Culper Research issued a report alleging that "LifeMD appears to use unlicensed doctors to dispense OTC medications, has implemented an autoshipping/autobilling scheme, failed to honor guarantees, and put in place abusive telemarketing practices." The report also alleged that several of the Company's executives were involved in "wide ranging fraud" at Redwood Scientific, which was charged by the U.S. Federal Trade Commission for "unlawful autoshipping, abusive telemarketing, and false claims." Moreover, according to Culper Research, "many customers are effectively duped into purchasing subscriptions rather than one-time purchases" and LifeMD "makes cancellations difficult if not impossible." Specifically, the report discussed LifeMD's executives involvement with Redwood Scientific:

**LifeMD Executives Omit "Wide Ranging" Redwood Scientific Fraud from Their Resumes**

We are highly concerned that LifeMD executives have not disclosed their involvement in material fraud, namely in Redwood Scientific, prior to their joining LifeMD. We find this especially concerning in light of the business practices we believe are occurring at LifeMD which mirror those that landed Redwood federal charges. Redwood claimed, in part, to "develop and market consumer homeopathic drugs and supplements … All the company's products are sold either through a membership subscription model (a direct marketing program) or at any given number of retail locations." Redwood even claimed a revolutionary product for erectile dysfunction, just as LifeMD now apparently sells OTC ED pills relying on

unlicensed doctors. However, in October 2018, the FTC took notice and prosecuted Redwood for what they called a "wide ranging scheme of fraud and deception."

[image omitted]

Furthermore, the Defendants not only executed the fraud at Redwood, but after it was discovered, were found to have lied and obstructed the Courts, hiding their millions in illicit proceeds generated from the scheme. We believe many of these same practices have made their way to LifeMD, where the Company is now subjecting itself to the same risks.

Apparently unbeknownst to LifeMD investors, at least 4 current and past LifeMD executives were intricately involved at Redwood:

- LifeMD CEO Justin Schreiber was Redwood's own formation agent and incorporator listed in the Redwood's initial Puerto Rico formation documents. He was also a significant shareholder.

- LifeMD CTO Stefan Galluppi was Redwood's CTO. LFMD initially disclosed Galluppi's history with Redwood in its 2016 Form 10-K, yet removed these disclosures in 2017.

- LifeMD former CFO Juan Manual Pinero Dagnery was a significant Redwood shareholder.

- Finally, LifeMD former CFO Robert Kalkstein was a significant Redwood shareholder. LifeMD's investor presentation omits Redwood from Schreiber's, Galluppi's, and Pinero Dagnery's biographies, in our view suggesting a cover-up attempt after the fraud was discovered.

25.    Culper Research also compared the fraudulent practices at Redwood Scientific with

the Company's current sales tactics, stating:

LifeMD Practices Mirror the Redwood Scientific Fraud

In light of the Company's apparent cover-up of involvement in the "wide-ranging fraud" at Redwood (per the FTC), we are particularly concerned by LifeMD practices which we think mirror those at Redwood. In short, we think LifeMD's business is fatally flawed, unsustainable, and likely to draw regulatory scrutiny, especially in light of Schreiber and Galluppi's histories:

| Redwood **Allegations, per the FTC** | Culper Research Views on LifeMD |
|---|---|
| "Defendants … bilked consumers out of millions of dollars through baseless advertising claims for products that purport to alleviate serious health conditions… rely on false or unsubstantiated claims…" | LFMD claims its "real doctors" are registered in 46 states, yet the very first doctor touted by RexMD has numerous disciplinary actions and a revoked DEA registration. Dispensing pills without a valid license is a felony offense. |
| "…autoship continuity plans bill consumers monthly for unwanted products… Defendants also make it difficult for consumers to cancel those plans and get their money back." | LFMD touts "ARR from subscriptions" yet we think much of this business originates from autoship programs unbeknownst to customers. |
| "The complaint also alleges that the defendants did not honor their "money-back" guarantee…" | LifeMD offers varying "guarantees" ranging from 60 days to 90 days. Customer reviews allege that these guarantees are not honored. |
| "Defendants have turned to abusive telemarketing practices by delivering prerecorded marketing messages to millions of consumers." | LifeMD product reviews allege a pattern of similar conduct, including abusive marketing phone calls. |

26.     Culper Research highlighted that certain doctors at the Company's core businesses had disciplinary actions and revoked licenses. Specifically, the report stated:

> LifeMD's two core businesses are Shapiro MD (hair loss products at 57% of 2020 product revenues) and RexMD (ED pills and associated products at 42% of 2020 product revenues). We've found highly problematic practices at both Shapiro MD and RexMD.
>
> RexMD's "Best Physicians" and "Real Doctors" – Meet Dr. Roozbeh Badii
>
> RexMD claims to offer "telemedicine for men", which in practice means generic ED pills are prescribed through doctors over the internet. On the Q4 2020 conference call, CEO Schreiber stated that, "our vision has always been to radically change health care by making access to the best physicians, diagnosis and treatment, easily accessible, convenient and affordable." Perhaps Schreiber has a different definition of "the best physicians", as the very first doctor listed by RexMD – Roozbeh Badii – has had his license to practice suspended or otherwise revoked in several states, including Florida, where the Company still claims he is licensed to practice:
>
> [image omitted]
>
> In May 2020, the State of Virginia suspended Badii's license in connection with his failure to cooperate with an investigation of his telemedicine prescribing practices:

Dr. Badii was licensed by the Board to practice medicine in the State of Maryland on October 17, 2011. His license expired on September 30, 2018.[3] In or around February 2018, the Board initiated an investigation of Dr. Badii, under case number 2218-0147B, following a complaint filed by a pharmacy benefit management organization regarding Dr. Badii's telemedicine prescribing practices. As part of this investigation into Dr. Badii's prescribing practices, the Board issued a subpoena to Dr. Badii for the complete medical records of ten patients and a subpoena to Dr. Badii to appear at the Board for an interview on July 12, 2018. Dr. Badii failed to comply with either subpoena despite numerous requests for the information.[4]

On March 31, 2021, the DEA published notice of the revocation of Badii's DEA registration, following the State of Virginia. The order noted that it is a felony to dispense controlled substances without a current valid license: [image omitted]

- In October 2020, the State of Connecticut suspended Badii's license, characterizing his continued practice as "a clear and immediate danger to the public health and safety."

- In December 2020, the State of Florida suspended Badii's license after having previously placed conditions on his license in November 2017, hence RexMD's claim that Badii is licensed in Florida is false.

- Badii was also reprimanded or placed on probation in Maryland (November 2016), Ohio (February 2017), New York (September 2017), Michigan (March 2018), California (June 2018), and Massachusetts (September 2019).

\*       \*       \*

RexMD Also Appears to Have Falsely Claimed Dr. Joshua Kalter is Licensed in California

Prior to Dr. Badii, a November 2019 archived version of RexMD's website claimed another one of its doctors was Dr. Joshua Kalter, a licensed physician in California:

[image omitted]

However, the Medical Board of California shows zero resultsfor any licensed doctors by the name of Joshua Kalter, indicating that Kalter has never in fact held a license in California as claimed by RexMD. Docinfo reports that Dr. Kalter is licensed only in the state of Massachusetts, where a simple Google search also reveals that he resides. We call on LifeMD to disclose a full list of its so-called

"fully licensed" physicians who have prescribed drugs for the Company in the past 24 months.

27.    According to Culper Research, LifeMD "engages in autoshipping, makes cancellations difficult if not impossible, and telephones consumers possibly in violation of TCPA laws." Specifically, it stated:

> LifeMD touts its supposed "recurring revenue" generated from subscriptions, which in Q4 2020 amounted to 82% of total Company revenues. On the Company's most recent conference call, CEO Schreiber himself admits to autoshipping, as he states, "it's truly recurring basis every month. It's auto-shipped, auto-charged." This line rings familiar to the one touted by Redwood, which claimed to sell product through a "membership subscription" model. However, just as for Redwood, we think many customers are effectively duped into purchasing subscriptions rather than one-time purchases. See for example a review by "Lady Alopecia"3 which, even as she compliments the shampoo itself, encourages her readers to order from Amazon, rather than directly from the Company, as it appears "Shapiro is running a kind of scam":

## Disclaimer: A word of warning!!

Update Dec 2020: It looks like not ALL reviews are positive after all. I've had two people write to me this week saying that Shapiro MD is running a kind of scam where they a) ship you products you didn't ask for or b) refuse to accept returns and will charge your card anyway. That's why I would advise: DO NOT buy direct from the manufacturer!! Order from Amazon instead – you still get the benefits of the shampoo but without getting signed up for an auto-renew policy. ☹

See a table of recent Shapiro MD reviews via Sitejabber, a few of which note product purchases through Facebook:

| Date | Review Comments |
|------|-----------------|
| 8/14/2020 | I only ordered once via Facebook. It took nearly a month for the order came then a week later I got automatic charge to my account for the next order which I did not authorize. I tried to call customer service and got no response yet. I'm very frustrated with this company. I just wanted to return all the products and do not want to have any further business with this company. |
| 4/24/2020 | I thought the purchase for 4 months was only 50 some dollars and it came up as 200 and something. Not impressed |
| 2/1/2020 | I simply want to reorder the shampoo and the foam for one month and at every turn you are trying to sell me packages and things I am not interested in. Then I cannot add more than one item to a single order. Your website is designed to boost sales through the creation of customer frustration. It really sucks. |
| 3/2/2020 | I received and used my product for a month. After experiencing increased hair loss the look of greasy hair. I stopped. Called customer service to use the guarantee and was told that because I contacted customer service previously that it voided the guarantee. I am 100% dissatisfied and stuck with three months of your 'product'. I am issuing a complaint to FB. |

Reviews of this kind are not unique to Sitejabber nor to Shapiro MD; see a table of recent RexMD customer reviews via Trustpilot:

| Date | RexMD Review Comments |
|------|-----------------------|
| 4/2/2021 | Signed up for one time prescription and then received a second and they wouldn't refund my money. Don't use Rex MD. |
| 3/29/2021 | Horrible customer service. Appears to be on the edge of being fraudulent DONT BUY ANYTHING FROM THIS COMPANY Took 30 days to get a reply and then only excuses Never received what I ordered Had to go to my credit card and file fraudulent report to get my money back. |
| 3/26/2021 | Thought I'd save some money & take advantage of a Groupon and try RexMD. BIG MISTAKE. Not only did it take a eight days to get the script I was bothered, daily, by erroneous texts telling me to call due to a problem with my order that didn't exist. Finally got my order AND IT WAS THE WRONG SCRIPT! Won't be using again! |
| 3/14/2021 | They don't know how to stop re-occurring payments after you tell them to stop they cost me a overcharge with my bank |
| 3/13/2021 | They did not process my cancellation from December. Forced me to take another delivery. No answer on customer service number. Received email stating they can't stop order even though their tracking number hasn't showed up on USPS. |
| 3/7/2021 | Although they are not legally bound by HIPAA regulations since they don't take insurances, beware they will call your phone and start asking about the medications you have or may consider purchasing from them to whoever answers the phone. Definately a violation of privacy. I won't be using this company! |

13

28.    Culper Research further questioned whether LifeMD's purported telehealth platform existed because the firm was "unable to find that Veritas MD was even available for public use." The report stated:

> Back in the real world however, we were unable to find that Veritas MD was even available for public use. We found no associated apps on either the iOS or Android stores, nor could we determine any method by which consumers could sign up for the supposedly "state-of-the-art" telehealth service. Indeed, Veritas MD's website only offers rudimentary graphic depictions of an apparently non-existent app, and a contact form for interested service providers. Per the Q4 2020 conference call in March 2021, the Company now claims Veritas MD is being rebranded and that "we're aiming to launch it this summer." We thus ask the Company under what conditions it felt qualified to issue a press release claiming a "launch" in December 2020. We find the claims indicative of management's willingness to trumpet promotional material while at the same time sweeping uncomfortable truths under the rug.
>
> *      *      *
>
> Instead, we think LifeMD is a cash-burning direct marketing response business. The core driver of Rex MD, the Company's pill-pushing business, is a paid search and web marketing operation which only incinerates more shareholder cash over time. In order to generate traffic to its website, the Company must spend heavily on Facebook and paid search ads. Top keywords include "Viagra online", "generic Viagra", and "Cialis". SimilarWeb indicates that RexMD and Shapiro MD traffic originating from Paid Search and Facebook is multiples higher than for Hims. We estimate that RexMD spent $18.0 million in marketing spend in Q4 2020 alone, almost rivaling Hims despite the Company generating just $6.45 million in revenues compared to $40.1M for Hims[.]

29.    On this news, the Company's share price fell $2.84, or 24%, to close at $9.00 per share on April 14, 2021, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired LifeMD securities between January 19, 2021 and April 13, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families

and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LifeMD's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of LifeMD shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by LifeMD or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

33.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of LifeMD; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

35.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

36.      The market for LifeMD's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, LifeMD's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired LifeMD's securities relying upon the integrity of the market price of the Company's securities and market information relating to LifeMD, and have been damaged thereby.

37.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of LifeMD's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about LifeMD's business, operations, and prospects as alleged herein.

38.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LifeMD's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

39.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

40.     During the Class Period, Plaintiff and the Class purchased LifeMD's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

41.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding LifeMD, their control over, and/or receipt and/or modification of LifeMD's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning LifeMD, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

42.     The market for LifeMD's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, LifeMD's securities traded at artificially inflated prices during the Class Period. On February 17, 2021, the Company's share price closed at a Class Period high of $30.55 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of LifeMD's securities and market information relating to LifeMD, and have been damaged thereby.

43.     During the Class Period, the artificial inflation of LifeMD's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about LifeMD's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of LifeMD and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted

in Plaintiff and other members of the Class purchasing the Company's securities at such artificially

inflated prices, and each of them has been damaged as a result.

44.     At all relevant times, the market for LifeMD's securities was an efficient market

for the following reasons, among others:

(a)     LifeMD shares met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, LifeMD filed periodic public reports with the SEC

and/or the NASDAQ;

(c)     LifeMD regularly communicated with public investors via established

market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures,

such as communications with the financial press and other similar reporting services; and/or

(d)     LifeMD was followed by securities analysts employed by brokerage firms

who wrote reports about the Company, and these reports were distributed to the sales force and

certain customers of their respective brokerage firms.  Each of these reports was publicly available

and entered the public marketplace.

45.     As a result of the foregoing, the market for LifeMD's securities promptly digested

current information regarding LifeMD from all publicly available sources and reflected such

information in LifeMD's share price. Under these circumstances, all purchasers of LifeMD's

securities during the Class Period suffered similar injury through their purchase of LifeMD's

securities at artificially inflated prices and a presumption of reliance applies.

46.     A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

47. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of LifeMD who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

48.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase LifeMD's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

50.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LifeMD's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about LifeMD's financial well-being and prospects, as specified herein.

52.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of LifeMD's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LifeMD and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

53.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

54.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and

for the purpose and effect of concealing LifeMD's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

55.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of LifeMD's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired LifeMD's securities during the Class Period at artificially high prices and were damaged thereby.

56.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that LifeMD was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their LifeMD securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     Individual Defendants acted as controlling persons of LifeMD within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, LifeMD and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

25

Dated: April 16, 2021                    By: */s/ Gregory B. Linkh*
                                         **GLANCY PRONGAY & MURRAY LLP**
                                         Gregory B. Linkh (GL-0477)
                                         230 Park Ave., Suite 358
                                         New York, NY 10169
                                         Telephone: (212) 682-5340
                                         Facsimile: (212) 884-0988
                                         Email: glinkh@glancylaw.com

                                         Robert V. Prongay
                                         Charles H. Linehan
                                         Pavithra Rajesh
                                         1925 Century Park East, Suite 2100
                                         Los Angeles, CA 90067
                                         Telephone: (310) 201-9150
                                         Facsimile: (310) 201-9160

                                         **THE LAW OFFICES OF FRANK R. CRUZ**
                                         Frank R. Cruz
                                         1999 Avenue of the Stars, Suite 1100
                                         Los Angeles, CA 90067
                                         Telephone: (310) 914-5007

                                         *Attorneys for Plaintiff David L. Owens Sr.*

**SWORN CERTIFICATION OF PLAINTIFF**

**LIFEMD, INC. SECURITIES LITIGATION**

I, David L. Owens Sr., certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the LifeMD, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in LifeMD, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

4/14/2021

_____
Date

_____
David L. Owens Sr.

**David L. Owens Sr.'s Transactions in LifeMD, Inc. (LFMD)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 1/19/2021 | Bought | 204 | $7.64 |
| 1/19/2021 | Bought | 23 | $7.72 |
| 1/19/2021 | Bought | 100 | $7.72 |
| 1/19/2021 | Bought | 100 | $7.72 |
| 1/19/2021 | Bought | 100 | $7.72 |
| 1/26/2021 | Bought | 216 | $14.25 |
| 2/4/2021 | Bought | 100 | $21.45 |
| 2/4/2021 | Bought | 172 | $23.22 |
| 2/4/2021 | Bought | 172 | $23.14 |
| 2/5/2021 | Bought | 4 | $21.97 |
| 2/22/2021 | Bought | 72 | $26.38 |
| 2/23/2021 | Bought | 42 | $19.90 |
| 2/23/2021 | Bought | 100 | $19.86 |
| 3/2/2021 | Bought | 185 | $19.20 |
| 3/3/2021 | Bought | 1 | $15.74 |
| 3/3/2021 | Bought | 58 | $15.80 |
| 3/3/2021 | Bought | 100 | $16.29 |
| 3/3/2021 | Bought | 58 | $16.55 |
| 3/3/2021 | Bought | 60 | $17.20 |
| 3/3/2021 | Bought | 115 | $17.24 |
| 3/4/2021 | Bought | 96 | $14.02 |
| 3/4/2021 | Bought | 110 | $14.13 |
| 3/5/2021 | Bought | 1 | $16.16 |
| 3/5/2021 | Bought | 3 | $16.37 |